TOBIAS, J.,
concurs in part, dissents in part, and assigns reasons.
|TAs the Louisiana Supreme Court has said and the Louisiana Courts of Appeal have reiterated many times:
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that the reviewing court must always keep in mind that if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
See, Stobart v. State, Dept. of Transportation & Development, 617 So.2d 880, 882 (La.1993) (internal citations and quotation marks omitted). With the foregoing in *918 mind, I conclude that this court is required to affirm the trial court’s decision insofar as the trial court judgment awards damages to Joseph Barcia, Marvin |gBaudean, Peter Becker, Jr., and Roy Phillips and dismisses the claims of Ronald Gilmore; but I find that an affirmation of the award to Salvadore A. DiCarlo is legal error because his claim is prescribed. My comments follow:
Murphy Oil USA, Inc. (a/k/a and fik/a Murphy Oil Corporation) (“Murphy”) contends that the plaintiffs failed to prove that their exposure to noise was “dose sufficient” to cause long-term hearing loss versus gradual hearing loss due to the passage of time and the aging process.[1] The plaintiffs are now senior citizens. Stated another way, the question presented is: Did an average exposure to noise during the workweek above 85 dBA but below 90 dBA for extended periods of time cause a hearing loss to these plaintiffs? The trial court held in the affirmative, finding that Messrs. Barcia, Baudean, Becker, Phillips, and DiCarlo were exposed to 85 dBA and “most probably” were exposed to levels at or greater than 90 dBA.[2]
The plaintiffs’ expert, Dr. Moisés Arria-ga, relied on ' a sound level meter that registers a single reading of a noise area at one particular point in time, thus merely shedding light on the sound intensity at that moment, but failing to measure duration of exposure. He opined that the plaintiffs were exposed to sufficient noise on a time weighted average (over an eight-hour day workweek for years) to cause a gradual hearing loss over time. He further relied upon the reporting of two witnesses that stated they had experienced temporary threshold shift (i.e., at the end of a work shift they experienced a ringing in their ears and a sense of decreased hearing loss) to substantiate noise exposure significant to cause a hearing loss. This evidence is, in my opinion, weak because it does not take into account each plaintiffs location in the Murphy facility. While the two witnesses did testify to experiencing temporary threshold shift, they failed to testify as to the frequency of experiencing the effect. Arguably this could negate or minimalize the ^strength of plaintiffs’ expert’s opinion. Contrariwise, Murphy’s monitoring of 29 of its employees using a dosimeter found but one instance of exposure to 90 dBA on a time weighted average.
Although the trial court opined that Murphy failed to provide an alternative cause for the plaintiffs’ hearing loss, such was not Murphy’s burden. It was incumbent upon the plaintiffs to establish that the noise exposure at the Murphy facility more likely than not caused each plaintiffs hearing loss; that is, it was not Murphy’s burden to prove that something other than noise at their facility caused the hearing loss. Actually, the record per se reflects another theory of the plaintiffs’ hearing loss at the time suit was filed, to-wit, age of the plaintiffs and their mere continuing to remain alive.
Murphy asserts that the trial judge is wrong to emphasize long-term exposure to noise to substantiate his findings; the length of time of exposure would be irrelevant if the level (“dose”) of exposure over time was insufficient to cause a loss of hearing. Such brings one back to the ultimate question of whether or not expo *919 sure to more than 85 dBA on a time weighted average, but less than 90 dBA, is substantial enough to cause a meaningful hearing loss.
Thus the trial court had to choose between two conflicting opinions of experts. On the one hand, plaintiffs’ expert relies on sound level measurements to postulate that the time weighted average of noise that the plaintiffs were regularly exposed to as at or exceeded 90 dBA. On the other hand, Murphy’s expert, relying on dosimeter readings, says the opposite and that anything less than 90 dBA would not have caused the hearing loss of which the plaintiffs complain. It is within the discretion of the trial judge to accept one expert’s opinion over that of another expert. And as the Court said in Stobart, although an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, treasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony and the reviewing court must always keep in mind that if the trial court findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently-
I do not find that the trial court’s refusal to admit evidence of similar noise exposure at Tenneco Oil’s facility is error. Murphy sought to introduce the evidence to corroborate its expert’s opinion that dosimeter (versus sound level meter) readings on a time weighed average show that the noise exposure of the plaintiffs could not have caused their hearing loss. Although the sound-causing machinery at Tenneco Oil may have been similar, we lack evidence of where and how the machinery was situated and the proximity of machines to each other. That is, the evidence sounds in speculation.
The prescription issue and whether the doctrine of contra non valentem, agere nul-la currit praescriptio[3] applies is a relatively close question under the facts of this case at least as to some of the plaintiffs. The trial court clearly concluded that the plaintiffs were simple-minded, never connecting the noise exposure at work as a cause of their hearing loss. In part, this is based upon some evidence that Murphy may not have revealed to the plaintiffs the results of audiograms, et cetera, coupled with the plaintiffs’ lack of recollection of ever being told the results |sof hearing tests that would disclose hearing impairment. I do not find that the trial court’s holding is manifestly erroneous or clearly wrong except as to Mr. DiCarlo.
The following excerpts are taken from Mr. DiCarlo’s testimony:
* ⅜ *
Q What was your next job?
A Then I went to in the units as an operator and I stood — I was a cat helper, a catalyst operator helper, I guess a year or two years. I don’t remember really.
Q All right. Since you started at Murphy as a lab tester, and now we *920 have you as a cat helper, what was the nosiest place you worked in those first four positions?
A Well, it was one steady noise in the units. You understand? My worst noise I ever heard was when I worked on the boilers, which was my next job.
* * *
Q Describe the control room for the boilers when you went there.
A I couldn’t believe I was working there, the conditions with the noise. The control room was, more or less, they had tin around the building, around the boilers, and some of it was missing and the noise was terrible.
Q How long did you stay at the boiler?
A One year.
* * *
Q In an average five-day week, how much time did you spend in your shop versus how much time did you spend in the units?
A Well, I guess about 90 percent of the time I was out in the units. That is where the work was. The only time we worked out of the shop is 16when we had to take measurements in the units and come cut the insulation.
Q Were there any parts of this plant more noisy than others, in your opinion?
A Yes.
Q Tell us what they were.
A The cat crackers had a lot of noise and the boilers was the worse.
[[Image here]]
Q Let’s try to tie it to what job you had. What were you doing when hearing protection finally came to Murphy Oil?
A Hearing protection came, I think, in '74. By that time I had lost my hearing.
Q When you say it came, tell me how you know it came to Murphy at that point?
A What, the year?
Q No, you said '74. What happened in '74?
A I think the hearing plugs came into play.
Q All right. They were made available to you?
A Yes, either maybe in '74 or a little bit later. That has been so long ago, I can’t remember the time.
[[Image here]]
Q And you currently use hearing protection when using that riding mower?
A I did. When I retired I wore the hearing aids, I mean the earplugs, and it got so that if I didn’t 17have them on, it didn’t make no difference. I was so used to the noise, you know.
[[Image here]]
Q And also, when you did insulation work, did you ever have to do insulation work around the platform heaters?
A Yes, in the area, yes.
Q And weren’t there signs warning about loud noises and using hearing protection near the platform heaters?
A That came into play later. Like I said, the hearing plugs came into play in '74. I don’t recall what signs, you know. You are talking about 45 years plus.
Q So is it fair to say that there may have been signs, you just don’t remember?
A I don’t remember.
Q And I believe you said that the worse noise was when you worked around the boilers?
A Yes.
*921 Q And you worked around the boilers about one year?
A That’s correct, one year.
[[Image here]]
Q And sometime in the early 70’s Murphy made hearing protection available?
A That is what I was told, yes. As far as I know '74.
Q And the hearing protection that was available in '74 going forward was earplugs or earmuffs, is that correct?
IsA Yes.
Q And starting back around this time, hearing protection was available in boxes in the control room?
A I think so. I am not quite sure, you know.
Q Hearing protection was also available in the warehouse, correct?
A Oh, you mean — yeah, for distribution.
Q Yes, you cold pickup the plugs or the earmuffs, whatever you wanted to use?
A Yes, yes, yes.
Q They were also available in the safety department, correct?
A I guess so, yes. Yes.
Q And when you were out on the units making your rounds, you wore hearing protection, didn’t you, when you were an operator?
A Before '74,1 didn’t.
Q After 1974.
A lam sorry. Yes.
⅜ ⅝ ⅜
Q And when you were working with insulation, you would be all over the refinery, correct?
A That’s right.
Q And the noise that would have existed would have been as a result of the equipment that was running near the area where you were working?
IsA Yes, pumps and so forth, compressors and whatever.
Q When you were working around these areas in the units where they had running equipment that was causing the noise, the noise wasn’t so bad that you would have trouble communicating with the person next to you, correct?
A It all depends how close you were to the equipment.
Q So there were times when you wouldn’t have trouble and there were times when you did?
A Yes, yes, yes.
[[Image here]]
Q By the time hearing protection came to Murphy in '74, you had already noticed that you had a hearing loss?
A Yes. Yes. I couldn’t help but lose my hearing with all that noise around there. Especially when I worked the boilers.
[[Image here]]
Q The question was brought up about heaters. What provides the heat in the heater?
A Well, the boilers, the heaters, they are gas-fired heaters and they made a lot of noise, too, the heaters.
[[Image here]]
Q I am going to show you Exhibit 114.
THE COURT:
Plaintiff or defense?
MR. J. WAYNE MUMPHREY:
Plaintiff.
JjjMS. FISCHMAN:
We have it. Thank you.
Q First I want to ask you, Mr. Di-Carlo, on 114, is that your signature?
*922 A Yes.
Q And the date on it?
A (No response.)
Q What is the date?
A It’s 04/02/82.
Q Did you have diabetes in 1982?
A I don’t think so.
Q And this is your audiogram from '82? That is your signature?
A Yes, that is my signature.
As the trial court noted in its reasons for judgment and the record reflects, Mr. Di-Carlo stated: ‘Yes, yes, I couldn’t help but lose my hearing with all that noise around there. Especially when I worked around the boilers.” (Mr. DiCarlo ended his employment with Murphy in 1993; therefore, any hearing-damaging noise that he experienced occurred more than one year prior to his filing suit.) Although the trial court tries to minimize Mr. DiCarlo’s testimony about his knowledge of noise at Murphy actually causing his hearing loss to reach its conclusion, unlike the remaining plaintiffs for whom an award is made, I find that his testimony when read as a whole and as noted more specifically above is (a) sufficiently unambiguous and (b) establishes that a reasonable person would have inquired further to ascertain whether the noise at Murphy was causing a hearing |, floss. Therefore, I do not find that Mr. DiCarlo can claim the benefits of the fourth category of contra non valentón, and his claim is thus prescribed.
In sum, I respectfully concur in the majority’s decision to affirm the judgment in favor of Messrs. Barcia, Baudean, Becker, and Phillips for I find that the trial court’s decision is neither manifestly erroneous nor clearly wrong as to them. I respectfully dissent from the majority’s affirmation of the judgment in favor of Mr. DiCarlo.

. In my view, hearing loss is substantially similar to lead poisoning — for lead accumulates in the body over a long period of time and the effects are gradual and not necessarily known to the injured party.

. I read “most probably” to mean more likely than not.

. The four possible prongs of the doctrine of contra non valentem are: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or (4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiffs ignorance is not induced by the defendant. The plaintiffs fall under the fourth category if at all.